IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ISAIAH RODDY, JR.,

      Plaintiff,

vs.                                                       No. CIV 10-0646 JH/CEG

THE CORNELL MEDICAL SERVICES OF
THE REGIONAL CORRECTIONAL CENTER,

      Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** is before the Court on Plaintiff's Prisoner's Civil Rights Complaint ('Complaint') (Doc. 1), Defendant's *Martinez* Report ('*Martinez* report') (Doc. 18) and Defendant's Reply to the *Martinez* Report ('Reply') (Doc. 21). Isaiah Roddy, Jr., has alleged that Cornell Medical Services ('Cornell') violated his constitutional rights by failing to provide adequate medical care during his incarceration at the Regional Correctional Center ('RCC'). (Doc. 1 at 3-5). In its *Martinez* report, Cornell asks that this Court grant summary judgment against Roddy on all claims based on his failure to exhaust administrative remedies and his inability to show either that his constitutional rights were violated or that any violation was due to Cornell's policy or custom. (Doc. 18 at 10-15). The Court, having considered the parties' submissions, the relevant law, and otherwise being fully advised in the matter, **FINDS** that Roddy failed to exhaust his administrative remedies and that there is no genuine dispute of material fact as to whether Cornell was deliberately indifferent to Roddy's serious medical needs. Therefore, the Court **RECOMMENDS** that summary judgment be **GRANTED** in favor of Cornell on all claims and

that the Complaint be **DISMISSED WITH PREJUDICE**.

**I.     Background**

In the Complaint, Roddy alleged that Cornell violated his Eighth Amendment rights by (1) delaying a biopsy of his prostate and (2) neglecting to dispense his medication in a timely fashion. (Doc. 1 at 2, 3). The facts giving rise to these claims occurred during Roddy's incarceration at the RCC, which was operated by a private company, Cornell Companies, Inc. (Doc. 18 at 1). Roddy was placed in the RCC on February 12, 2010 as a detainee in the custody of the United States Marshal's Service. (Doc. 1 at 1; Doc. 18 at 1).

Upon Roddy's arrival, Cornell personnel conducted a health screening and a physical examination. (Ex. A at 0239-40, 0245).[1] Roddy states that he informed Cornell that he had the following conditions: "(a) hypertrophy (benign) of prostrate [sic] w/ urinary obstruction and other lower urinar [sic], (b) esophagus, irregular 2-line, (c) mild systemic disease, (d) sleep apnea, (e) epistaxis, frequently, (f) borderline blood pressure, needs frequently to be checked, (g) glacoma [sic] in right eye, medicine perscribed [sic]." (Doc. 1 at 4-5). The Cornell employee conducting the physical identified the following conditions on February 16, 2010: (1) "BPH,"[2] (2) glaucoma, (3) "GERD,"[3] (4) asthma and (5) back

---

[1] Unless otherwise noted, all cited exhibits are attached to Doc. 18, the *Martinez* report. All exhibit page numbers are drawn from the Bates' stamped numbers on each exhibit, but the "CCI" preface to each number is omitted. The Court notes that the Bates' stamped numbers, while in order within each exhibit, are not in order between exhibits. However, this is the only numbering system that allows the Court to clearly indicate the citation.

[2] "BPH" denotes Benign Prostatic Hyperplasia, or a non-cancerous enlargement of the prostate. *See* STEDMAN'S MEDICAL DICTIONARY 853 (27th Ed. 2000) (definition under "hyperplasia, benign prostatic h."); Mayo Clinic Definition of prostate gland enlargement, *available at* http://www.mayoclinic.com/health/prostate-gland-enlargement/DS00027.

[3] "GERD" refers to gastroesophageal reflux disease, commonly known as acid reflux disease. *See* Mayo Clinic Definition of GERD, *available at* http://www.mayoclinic.com/health/gerd/DS00967.

2

pain. (Ex. A at 0240).

Roddy first expressed concerns about his prostate health on February 16, 2010, and he was seen that same day by a certified physician's assistant for his physical. (Ex. A at 0244; Ex. E at 0356). The physician's assistant offered to conduct a prostate/rectal examination at that time, but Roddy refused. (Ex. A at 0244). The physician's assistant was able to obtain Roddy's consent to procure his records from the Veteran's Administration. (Ex. C at 0277; Ex. H at 0424). Those records showed that, prior to Roddy's incarceration, he had been scheduled for two prostate procedures by the Veteran's Administration in December of 2009 that were not completed. (Ex. H at 0427). He did not have the biopsy done at the first appointment because he was "not prepared mentally" for the procedure. *Id.* He apparently did not return for the second appointment.

Roddy's next request relating to his concerns about prostate cancer was submitted on February 23, 2010. (Ex. E at 0355). He was seen by a medical professional the following day, and the records from the Veteran's Administration were reviewed. (Ex. D at 0289; Ex. C at 0277).

His final request relating to prostate cancer prior to being referred to an outside professional was submitted on March 11, 2010. (Ex. E at 0350). He was seen five days later and was referred to the University of New Mexico Hospital Urology Department ('UNMH'). (Ex. C at 0276; Ex. D at 0288). He was seen at UNMH on April 30, 2010 and was scheduled for a prostate biopsy on August 2, 2010. (Ex. H at 0413, 0418, 0423; Ex. C at 0275). Roddy complained that he was still awaiting a biospy procedure as of June 30, 2010, and that the delay in the procedure was causing him "extreme discomfort and stress." (Doc. 1 at 5). As dictated by policy and based on security concerns, Cornell did

not inform Roddy of the date for his biopsy. (Doc. 18 at 13; Ex. K at 0030). However, Cornell transported Roddy to UNMH on August 2, 2010, at which time the biopsy was completed, and Cornell again transported him for a follow-up appointment on August 17, 2010. (Ex. E at 0304, 0320; Ex. H at 0376, 0378-79).

Roddy also alleges that he was prescribed but did not receive Terazosin HCL for discomfort caused by his enlarged prostate and Accu-Check for his blood glucose level. (Doc. 1 at 5). Those are the only medications he specifically mentions in the Complaint. He does not state whether he never received the medications or whether the medications were not dispensed in a timely manner. However, the medication records from Cornell indicate that Roddy did receive Terazosin on a daily basis from February through September of 2010. (Ex. B). Roddy also alleged that, on March 11, 2010, "medication was prescribed, in which the medication should had [sic] already been dispensed for the Plaintiff's medical condition . . . ." (Doc. 4 at 2). Finally, he states that, on May 30, 2010, he "submitted stickers for the refills of eye medications in which was not refilled until 6-2-10." *Id.* Roddy has demanded that damages be awarded for the pain and suffering caused as well as for any future medical treatment required due to the delay in the biopsy procedure. *Id.* at 8. Though Roddy was incarcerated in the RCC at the time he filed the Complaint, he has since been released. (Doc. 12 at 1).

After reviewing the Complaint and Cornell's Answer, the Court ordered that Cornell produce a *Martinez* report responding to Roddy's claims and providing all relevant information. (Doc. 16). In the Order, the Court informed the parties that the information presented in the *Martinez* report and any responses thereto could be used in determining whether the Complaint should be dismissed. *Id.* Cornell filed its *Martinez* report and, in it,

requested that the report be construed as a Motion for Summary Judgment. (Doc. 18 at 1). Cornell asserts that it is entitled to summary judgment for two reasons: (1) Roddy failed to exhaust all available administrative remedies, as required by the Prison Litigation Reform Act ('PLRA'), 42 U.S.C. § 1997e , and (2) Roddy cannot present facts to support his Eighth Amendment claims under 42 U.S.C. § 1983. (Doc. 18 at 2). Roddy did not respond to the *Martinez* report.[4]

## II.  Summary Judgment Standard

Under the well-known standard, summary judgment should be granted when the record demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The record and all reasonable inferences therefrom must be viewed in the light most favorable to the nonmovant. *See Muñoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000). In determining whether there is a genuine dispute as to a material fact, the court can rely on materials in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." FED. R. CIV. P. 56(c)(1)(A). Affidavits used for this purpose "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.* at (c)(4).

To ascertain whether there were factual or legal bases to Roddy's claim, the Court

---

[4] By failing to respond to the *Martinez* report, Roddy waived his right to respond and to present evidence controverting the factual allegations contained in the report. *Luginbyhl v. Corr. Corp. of Am.*, 216 F. App'x 721, 723 (10th Cir. 2007) (citing *Reed v. Nellcor Puritan Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002). While this alone is not a sufficient basis to grant summary judgment, summary judgment may be appropriate if the uncontroverted facts meet the standard discussed below. *Id.*

ordered that a *Martinez* report be prepared. (Doc. 18). This report and the supporting documents can be used in determining whether to grant summary judgment, so long as the statements in the report are based on personal knowledge and sworn under penalty of perjury. *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991); *Hayes v. Marriott*, 70 F.3d 1144, 1147-48 (10th Cir. 1995) (citations omitted). However, the court may not "accept the factual findings of the prison investigation when the plaintiff has presented conflicting evidence." *Hall*, 935 F.2d at 1111 (citing *Sampley v. Ruettgers*, 704 F.2d 491, 493 n.3 (10th Cir. 1983)). The plaintiff's complaint can be relied on as well, so long as it is also based on personal knowledge and sworn under penalty of perjury. *Id.* (citing *Jaxon v. Circle K Corp.*, 773 F.2d 1138, 1139 n.1 (10th Cir. 1985)).

### III.   Exhaustion of Administrative Remedies

The PLRA was an attempt by Congress to "eliminate unwarranted federal-court interference with the administration of prisons" and to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo*, 548 U.S. 81, 93-94 (2006) (citing *Porter v. Nussle*, 534 U.S. 516, 524, 525 (2002)). To further this effort, Congress included a mandatory requirement that prisoners exhaust all administrative remedies provided by the prison before bringing a lawsuit. 42 U.S.C. § 1997e(a); *Woodford*, 548 U.S. at 94; *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002). In order to exhaust administrative remedies, a prisoner must properly complete the administrative review process that is set by the facility's grievance policy. *Jones v. Bock*, 549 U.S. 199, 218 (2007); *Thomas v. Parker*, 609 F.3d 1114, 1118 (10th Cir. 2010). This is true regardless of whether the remedy sought is actually available to the prisoner through the administrative process. *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner need not demonstrate in his complaint

that he exhausted all administrative remedies, but the defendants can raise failure to exhaust as an affirmative defense. *Jones*, 549 U.S. at 216.

In this case, Cornell has raised failure to exhaust as an affirmative defense (Doc. 18 at 10-11), and so the Court must look to the RCC policy on administrative remedies to determine whether Roddy complied with the exhaustion requirement. The RCC policy defines exhaustion of administrative remedies as "[t]he completion of the grievance process to include Administrative level appeal." (Ex. P at 0010-11). There are three levels to the RCC grievance policy. First, the inmate must submit an Informal Grievance Form, to which the Unit Manager responds. (*Id.* at 0012). If the complaint is not resolved, then the inmate may request and submit a Formal Grievance Form, which is processed by the Grievance Coordinator. (*Id.* at 0013, 0015-16). The Grievance Coordinator makes a recommendation based on the Formal Grievance Form and any investigation and/or response, and the Deputy Warden approves or denies this recommendation. (*Id.* at 0015-16). Finally, the inmate can appeal the Deputy Warden's decision to the Warden, whose determination is final. (*Id.* at 0016-17).

According to the affidavit of Joe Sprunk, Chief of Security at the RCC, and the supporting documents, Roddy filed one formal grievance and twelve informal grievances while incarcerated at the RCC. (Ex. O at ¶¶ 6-8; Ex. Q at 0224-36). The formal grievance involved a request for a refund of money that he was charged to make copies. (Ex. O at ¶ 6; Ex. Q at 0224). He did not appeal. The informal grievances complained of unsanitary distribution of medication, the lack of notice about medication distribution, the fact that he was charged for a medical appointment that did not resolve his nosebleeds, and the length of time it took to receive his eye drops. (Ex. O at ¶ 8; Ex. Q at 0228, 0229, 0232, 0234,

0235, 0236). Responses were issued to all of these complaints, and Roddy did not file any formal grievance other than the one mentioned above. (Ex. Q at 0224-36). Roddy has provided no additional information on this issue except a conclusory assertion that he sought relief through the appropriate channels, including submitting numerous sick call requests and grievances, but received "no reply, no response, no remedy." (Doc. 1 at 7).

Based on the documentation provided, the Court finds that Roddy did not exhaust his administrative remedies. He only filed one Formal Grievance Form, which he did not appeal. None of the informal grievances that he filed were related to his prostate biopsy. He filed one informal grievance related to a delay in the arrival of his eye drops, but he never filed a formal grievance on the issue, and so he could not appeal it to the final level of administrative review. Therefore, the Court concludes that Roddy did not satisfy the exhaustion requirement of the PLRA.

Ordinarily, where a prisoner fails to exhaust administrative remedies, his case is dismissed without prejudice. *Gallagher v. Shelton*, 587 F.3d 1063, 1068 (10th Cir. 2009) (citing *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1139 (10th Cir. 2005)). The purpose of a dismissal without prejudice is to give the facility an opportunity to address the prisoner's claims by forcing the prisoner to exhaust administrative remedies before refiling the case in the federal courts. *Woodford*, 548 U.S. at 94. Here, because Roddy has since been released from custody, such a resolution will not serve that purpose. In fact, if Roddy were to refile his complaint, since he is no longer incarcerated in RCC, he would not be subject to the exhaustion requirement. *See Norton v. The City of Marietta, OK*, 432 F.2d 1145, 1150 (10th Cir. 2005) ("[A] plaintiff who seeks to bring suit about prison life after he has been released and is no longer a prisoner does not have to satisfy the PLRA's

exhaustion requirements before bringing suit."). Therefore, the Court will consider the merits of his claims.

## IV. Eighth Amendment Claims

Roddy has alleged that the delay in his prostate biopsy and the delay in the receipt of his medication was cruel and unusual punishment. To succeed in an Eighth Amendment claim against a private corporation like Cornell, Roddy must establish that (1) Cornell's employees acted with "deliberate indifference to [his] serious medical needs," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), and (2) a policy or custom of Cornell caused the constitutional violation, *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690-695 (1978). Cornell asserts that Roddy has not offered proof as to either aspect to create a genuine dispute of material fact (Doc. 18 at 13-14), and this Court agrees.

Prisoners are forced to rely on prison authorities to access medical care, and so prison authorities have an affirmative obligation to provide adequate medical care to inmates. *Ramos v. Lamm*, 83 F.3d 559, 574 (10th Cir. 1980). Because of that duty, inadequate, delayed or denied medical treatment may constitute a violation of the prisoner's Eighth Amendment rights. *Estelle*, 429 U.S. at 103. However, not all claims that a prisoner received inadequate care establish constitutional violations. *Id.* at 105. Rather, the inmate must demonstrate that the prison officials exhibited deliberate indifference to his serious medical needs. *Ramos*, 83 F.3d at 575 (citing *West v. Keve*, 571 F.2d 158, 161 (3d Cir. 1978)).

To establish that prison officials were deliberately indifferent to his serious medical needs, Mr. Roddy must establish both the objective and subjective components of his Eighth Amendment claim. The objective component of a 'deliberate indifference' claim is

met if the deprivation is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (citations omitted). To prevail on the subjective component, Mr. Roddy must show "that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Martinez*, 563 F.3d at 1089 (quoting *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006)). Thus, mere negligence by prison officials or medical staff will not suffice to meet the subjective prong of deliberate indifference. *Estelle*, 429 U.S. at 105-06; *Ramos*, 639 F.2d at 575. On the other hand, deliberate indifference may exist where officials prevent an inmate from receiving recommended treatment or deny an inmate access to medical personnel capable of evaluating the inmate for needed treatment. *Ramos*, 639 F.2d at 575 (citing *Inmates of Allegheny Cnty. Jail v. Pearce*, 612 F.2d 754, 762 (3d Cir. 1979); *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977)).

    In this case, Roddy faces an additional legal hurdle. He is attempting to hold Cornell, a private corporation, vicariously liable for the actions of its employees under 42 U.S.C. § 1983. Pursuant to § 1983, the defendant must act "under color of state law." *See Monroe v. Pape*, 365 U.S. 167, 187 (1961). Where, as here, a corporate entity is performing the actions typically performed by a state or municipality, like operating a prison, that corporate entity can be sued under § 1983. *Richardson v. McKnight*, 521 U.S. 399, 413 (1997) (citing *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922 (1982)) (leaving the determination of whether the employees of a private corporation acted under color of state

law in violation of § 1983 to the district court); *Smith v. Cochran*, 339 F.3d 1205, 1215-16 (10th Cir. 2003) (citations omitted) ("[P]ersons to whom the state delegates its penological functions, which include the custody and supervision of prisoners, can be held liable for violations of the Eighth Amendment."). However, to succeed in a § 1983 action against a corporate entity acting as a municipality based on the acts of its agents, the plaintiff must prove that the agents in fact committed a constitutional violation. *Myers v. Oklahoma Cnty Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998). Additionally, the plaintiff must offer evidence that some policy or custom of the corporation was the direct cause or moving force behind the constitutional violation. *Monell*, 436 U.S. at 690-695; *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 820 (1985); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (citations omitted) ("[C]aselaw from this and other circuits has extended the *Monell* doctrine to private § 1983 defendants."); *Myers*, 151 F.3d at 1316.

Cornell admits that it was responsible for providing in-house medical care and transportation for off-site care to prisoners under a contract with Bernalillo County. (Doc. 18 at 5; Ex. I at ¶¶ 6-9). Thus, Cornell could be held liable under § 1983 if Roddy's Eighth Amendment claims have merit. However, the evidence presented by Cornell and not rebutted by Roddy demonstrates that there is no genuine dispute of material fact presented by the Complaint.

With regard to Roddy's claim pertaining to prostate cancer treatment, prostate cancer is certainly a serious medical need. However, the evidence presented by Cornell clearly establishes that there is no genuine dispute as to the subjective component of the deliberate indifference test. From the date he was incarcerated, Roddy was seen by medical professionals at least twice each month, and up to five times in both May and

11

August of 2010. (Ex. C at 0269-77). Cornell obtained the records from the Veteran's Administration, reviewed them, and referred him to UNMH in under thirty days. (Ex. D at 0288-89; Ex. H at 0424, 0427). Roddy was seen at UNMH on April 30, 2010, and the hospital scheduled a prostate biopsy for August 2, 2010. (Ex. C at 0275; Ex. H at 0418). Cornell's staff sought out medical services for Roddy at a hospital with the capacity to diagnose and treat prostate cancer, which is quite the opposite of preventing him from accessing the necessary evaluation or treatment. While it may have been frustrating for Roddy to wait from March of 2010, when he was referred to UNMH, to August of 2010, when the biopsy occurred, that delay resulted from UNMH's scheduling and not from any action or inaction by Cornell.[5] Cornell's staff did not disregard the possibility that Roddy had prostate cancer; in fact, they responded to his medical requests and sought out diagnosis and treatment on his behalf. Thus, this Court finds that Cornell's employees were not deliberately indifferent to Roddy's prostate cancer.

Roddy has also claimed that Cornell was not providing or refilling his prescribed medications in a timely fashion. However, he has not alleged that he suffered any harm resulting from the delays. Because Roddy has made no effort to demonstrate substantial harm, he has not met the objective prong of the deliberate indifference test. *See Sandifer v. Green*, 126 F. App'x 908, 911 (10th Cir. 2005). Furthermore, while there may be a dispute as to whether Cornell was negligent in reordering medication and refilling prescriptions, mere negligence is not sufficient to meet the subjective component of the deliberate indifference standard. *See Estelle*, 429 U.S. at 105-06; *Ramos*, 639 F.2d at 575.

---

[5] Notably, had Roddy completed the scheduled biopsy with the Veteran's Administration in December of 2009, and assuming that the biopsy showed that treatment was needed, he would have already been receiving treatment during the time period at issue.

Thus, the Court finds that Cornell's employees were not deliberately indifferent regarding Roddy's prescribed medications.

Because this Court finds that Cornell's employees did not violate Roddy's Eighth Amendment rights, Cornell cannot be held liable. *See Myers*, 151 F.3d at 1316. Even had Cornell's employees violated Roddy's constitutional rights, though, Cornell would not be liable. Roddy has never alleged that his constitutional rights were violated because of Cornell's policy or custom. Cornell has provided this Court with copies of its policies regarding health care administration, detainee medical services, detainee sick call services, and detainee injury, illness or death. (Exs. K-N). These policies provide detailed guidance to ensure that medical services are available to inmates and that the health care needs of inmates are met. The Court, therefore, finds that no policy or custom of Cornell was the driving force behind the alleged constitutional violations.

## V.     Recommendation

For the reasons set forth in this Proposed Findings and Recommended Disposition, the Court **RECOMMENDS** that Cornell's request for summary judgment included in the *Martinez* report be **GRANTED** and that the Complaint be **DISMISSED WITH PREJUDICE**.

---

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636 (b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

*[signature]*

_____
THE HONORABLE CARMEN E. GARZA
UNITED STATES MAGISTRATE JUDGE